UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

TRACY LYNN S.,                          )
                                        )
            Plaintiff,                  )
                                        )
      vs.                               )          Case No. 4:19 CV 3198 JMB
                                        )
ANDREW M. SAUL,                         )
Commissioner of the Social              )
Security Administration,                )
                                        )
            Defendant.                  )

**MEMORANDUM AND ORDER**

This matter is before the Court for review of an adverse ruling by the Social Security

Administration.  The parties have consented to the jurisdiction of the undersigned United States

Magistrate Judge pursuant to 28 U.S.C. § 636(c).

### I.  Procedural History

On December 14, 2016, plaintiff Tracy S. protectively filed an application for a period of

disability and disability insurance benefits, Title II, 42 U.S.C. §§ 401 *et seq*., with an alleged onset

date of April 22, 2016.  (Tr. 148-50, 66).  After plaintiff's application was denied on initial

consideration (Tr. 65-75), she requested a hearing from an Administrative Law Judge (ALJ).

(Tr. 86-87).

Plaintiff and counsel appeared for a hearing on September 24, 2018.  (Tr. 29-64).  Plaintiff

testified concerning her disability, daily activities, functional limitations, and past work.  The ALJ

also received testimony from vocational expert Lisa A. Courtney, R.N.  The ALJ issued a decision

denying plaintiff's applications on December 27, 2018.  (Tr. 10-24).  The Appeals Council denied

plaintiff's request for review on October 7, 2019.  (Tr. 1-6).  Accordingly, the ALJ's decision stands as the Commissioner's final decision.

## II.  Evidence Before the ALJ

### A.      Disability and Function Reports and Hearing Testimony

Plaintiff was born in May 1972 and was 43 years old on the amended alleged onset date. She lived with her husband and had a son away at college.  (Tr. 36-37).  She had one year of college and previously worked as an aide to a special-needs student, a receptionist, a janitor, and in accounts receivable.  (Tr. 165, 37-40).

Plaintiff listed her disabling impairments as rheumatoid arthritis, fibromyalgia, and degenerative disc disease.  (Tr. 174).  In February 2017, plaintiff was prescribed the antidepressant duloxetine, folic acid, gabapentin, hydrocodone, the immunosuppressant leflunomide, and vitamin D3.  (Tr. 177).   In her February 2017 Function Report (Tr. 201-08) and Supplemental Questionnaire (Tr. 213-15), plaintiff stated that she had constant lower back and leg pain and was unable to sit for long periods of time, lift and carry heavy objects, or walk distances.  Her pain made it difficult for her to concentrate.  She was no longer able to work, vacation, drive or ride in a car for long periods, and shop.  Her daily routine included completing light housework, napping, reading, making dinner if she was able, completing plank exercises, and watching television.  She and her husband both took care of pets.  She was able to prepare simple meals and one-pan dinners. She also completed laundry, vacuuming, dusting and dishes, doing a little at a time.  She was able to drive and went grocery shopping with her husband once every week or two, spending about an hour.  She was able to handle financial accounts.  Her hobbies included reading, watching television, and playing games on her phone, for 20 minutes at a time.  She used to be able to kayak, go away for a weekend, and go out with friends.  She noted that her social activities had changed

because she sometimes had to cancel plans due to pain.  She no longer felt comfortable with gatherings of friends and so socialized with friends and family by telephone or text.  She awoke several times a night due to pain.  Bathing took a lot of energy to complete and most days she had to choose between bathing and performing a daily task.  She did not need reminders to attend to her grooming or take her medications.  She got along with authority figures very well and had never been fired because of problems getting along with others.  She followed written instructions "well" and spoken instructions "ok," but had difficulty finishing what she started.  (Tr. 206).  She no longer handled stress well but handled changes in routine "ok."  (Tr. 207).  Plaintiff had difficulty with lifting, squatting, bending, standing, walking, sitting, climbing stairs, remembering, completing tasks, and concentrating.  She could walk while grocery shopping but then needed to rest.  In a narrative section, plaintiff explained that her life changed drastically in 2011 when she got fibromyalgia and she started missing work.  The medication she took for rheumatoid arthritis helped somewhat with her swollen joints, but she still missed a lot of work and social activities.  In April 2016, she started having pain in her back and down her left leg and that "changed everything." (Tr. 208).  She could not work or go on a planned family vacation.  Her life consisted of medical appointments and staying home.  Some days she struggled to get out of bed and other days she was able to shower, shop, or do housework.  Her pain was constant.

Plaintiff's husband completed a third-party Function Report.  (Tr. 216-23).  He wrote that he couldn't think of anything that plaintiff couldn't do before her illnesses.  Now, she could do some household chores, but she had to lie down a lot and was awake most of the night.  Back pain prevented her from cooking anymore, so he prepared meals when he was home and she fixed sandwiches or soup for herself while he was at work.  She could only complete inside chores and he carried laundry baskets and dog food for her.  She could work for 45 minutes at most, and her

3

chores generally took her most of the day.  Although she could drive, there were days when her back hurt too much.  She shopped about three times a month and her husband normally went with her.  She could no longer go kayaking or walking and spent her time reading and watching television.  She used social media to keep up with others and visited in person about once a month.  She could stay on her feet for about a half hour before having to rest for five or ten minutes.  When she was in pain, she had a hard time handling stress and paying attention.

Plaintiff testified at the September 2018 hearing that she started having issues with her back in April 2016.  She took time off from work and attempted to return on a part-time basis, working four hours a day.  Even with being able to get up whenever she needed to, she had difficulty focusing and did not last an entire week.  (Tr. 46).  She stated that she had constant pain in her low back that prevented her from standing, sitting, or walking for very long.  (Tr. 38).  She could sit in one position without moving for about five minutes and shifted between laying down, sitting, and standing every half-hour.  Her drive to the hearing had taken a little more than an hour and she had to stop once.  (41-42).  She could only walk for about 15 minutes.  She was constantly uncomfortable and shifted positions in an attempt to relieve her pain.  She was most comfortable when in a recliner with ice on her back.  Being in a swimming pool was most effective for relieving the pain, but that was not feasible.  The only medication that helped with the pain was hydrocodone, but it only took the edge off and she was worried about addiction, so she only took it about once a week, when she was going to a function or going shopping.  (Tr. 47).  She took Cymbalta for fibromyalgia and depression, the muscle relaxer Flexeril, and Ativan.  Her back and leg pain kept her from sleeping more than two hours at a time, and so she watched a lot of television at night and took naps during the day.  (Tr. 48).  She had recently had to change pain-management providers due to a change in her insurance and was scheduled for a nerve conduction study and

MRI the week after the hearing.  (Tr. 44).  Her pain had worsened in the 18 months since her last MRI.

In response to questions from the ALJ, plaintiff stated that she had tried six sessions of physical therapy without relief, cortisone injections, ablation, chiropractic care, exercise, yoga, pain medication, ice, and heat.  (Tr. 50).  She used ice about three times a day and spent four or five hours in the recliner each day.  She watched television and read in short bursts before getting up to move.  She could run to the store for a few items on her own.  She could not manage major shopping on her own.  She used a cart even if she needed only a few items in order to have something to lean on. (Tr. 51-52).  She walked the short distance to the mailbox most days, but walking tended to make her back flare up.

Plaintiff described her average day as "piddling around the house."  (Tr. 44).  She never did anything for great lengths of time and could not finish chores dues to pain.  She described herself as "in a constant circle" with housecleaning because she was physically unable to finish any one chore.  (Tr. 45).  If she started laundry, for example, she might not finish it due to pain.  She used to cook every day but now only sometimes fixed a simple dinner, while her husband cooked dinner when he came home.

Vocational expert Lisa Ann Courtney testified that plaintiff's past work in accounts receivable was classified as sedentary and skilled; her work as a receptionist was sedentary and semi-skilled; her work as a cleaner was light and unskilled; and her work as a teacher's aide was light and semi-skilled.[1]  (Tr. 54-55).  Ms. Courtney was asked to testify about the employment opportunities for a hypothetical person of plaintiff's age, education, and work experience who was limited to sedentary work who could occasionally use her arms to push or pull; occasionally

---

[1] The ALJ determined that plaintiff did not work as a teacher's aide long enough to meet the criteria for substantial gainful activity.  (Tr. 56).

operate foot controls; occasionally climb ramps or stairs but never climb ladders, ropes, or scaffolds; occasionally balance on narrow, slippery, or erratically moving surfaces; and occasionally stoop, crouch, kneel, or crawl. The individual could not use hazardous machinery, be exposed to unshielded mechanical parts and unprotected heights, and could not be required to drive. The individual was able to understand, remember, and carry out only simple and routine instructions and tasks consistent with unskilled jobs. (Tr. 56-57). According to Ms. Courtney, such an individual would be unable to perform plaintiff's past work. Other jobs were available in the national economy, such as envelope stuffer, inspectors, and table worker. These jobs would still be available if the individual also needed to change between sitting and standing every 30 to 60 minutes while remaining at the work station, for up to one-third of the work day. (Tr. 57-58, 62). These jobs remained even if the individual were further restricted from using foot controls, kneeling, or crawling. (Tr. 59). All work would be precluded if the individual was off-task 15 percent or more of an 8-hour workday; or had two or more unexcused absences in a month. (Tr. 59-60). In response to questions from plaintiff's counsel, Ms. Courtney testified that limiting the individual to only occasional reaching in all directions eroded the occupational base. Ms. Courtney stated that her testimony was consistent with the Dictionary of Occupational Titles (DOT), with the exception of information regarding sit-stand options, time off-task and absences, which the DOT did not address. Her testimony on these two limitations was based on her training and 30 years of experience "placing people, performing onsite job analyses, . . . writing job descriptions, and looking at employer-based job descriptions." (Tr. 60-61, 62-63).

### B.   Medical Evidence

Between October 2014 and October 2018, plaintiff received treatment for rheumatoid arthritis, fibromyalgia, and chronic pain in her low back and left leg. She had appointments with

6

her primary care physician, a rheumatologist, pain management specialists, and a chiropractor, in addition to consulting with neurologists and an orthopedist.   She was treated with steroid injections, radiofrequency denervation, and multiple medications, without significant relief.   She had MRIs, x-rays, nerve conduction velocity (NCV) studies, and electromyography (EMG) tests. A functional capacity evaluation completed in January 2018 found that she was severely limited in her tolerance for sitting, standing, and walking and did not demonstrate the ability to sustain productive work.   Plaintiff argues that the ALJ improperly evaluated opinions from her primary care physician and the results of the functional capacity evaluation.   Although the following recitation of the medical evidence focuses on resolving these issues, the Court has reviewed the entire record.

Plaintiff established care with primary care physician Brian Smith, M.D., in December 2015, for treatment of fibromyalgia and depression.  (Tr. 396–98).   At that time, plaintiff was being treated by rheumatologist Faye Cohen, M.D., for rheumatoid arthritis and was undergoing evaluation for a lesion in her skull, which was ultimately determined to be a small area of fibrous dysplasia.[2]  (Tr. 251–52).   Her current medications included Cymbalta, vitamins D and B–12, and Celebrex.   A physical examination was unremarkable.   Dr. Smith assessed plaintiff with fibromyalgia and generalized anxiety disorder, which were stable with Cymbalta. He resumed the NSAID Celebrex.   In April 2016, plaintiff began complaining of worsening backpain with occasional numbness in her feet.  (Tr. 393–95).  Walking took the edge off, while sitting and lying exacerbated the pain.   On examination, plaintiff had a mildly antalgic gait with tenderness in the low back.   Straight leg raising was negative.   X–rays showed partial sacralization of her 6th lumbar

---

[2] Fibrous dysplasia is an uncommon bone disorder in which fibrous tissue develops in place of normal bone. The irregular tissue can weaken the affected bone and cause it to deform or fracture.  Mayo Clinic - fibrous dysplasia (last visited Jan. 27, 2021).

vertebra, but otherwise normal alignment without compression fracture or spondylolisthesis.  (Tr. 390).  At her next visit on April 20, 2016, plaintiff reported that her pain was worse and was interfering with her sleep.  (Tr. 390–93).  Ice helped somewhat but she was not getting significant relief from Celebrex or Tylenol 3.  (Tr. 390–93).  Subsequent treatment with gabapentin was similarly ineffective for pain and plaintiff initially resisted taking narcotics.  (Tr. 389, 390–93, 387–89).  Chiropractic had made the pain much worse while physical therapy was initially helpful until plaintiff regressed again.  (Tr. 386).  At the end of April 2016, Dr. Smith excused plaintiff from work for two weeks with restrictions on lifting and repetitive motion on her return.  (Tr. 386–87).  He opined that her fibromyalgia was increasing her low back pain.  On May 16, 2016, Dr. Smith extended plaintiff's leave pending evaluation by orthopedic and pain management specialists.  She began taking hydrocodone in May 2016.  (Tr. 386).

During regular encounters with Dr. Smith through April 2017, plaintiff continued to report unrelieved back pain.  (Tr. 73–75, 371–72, 368–70, 360–62, 356–58, 351–54, 341–43, 537–41).  In June 2016, Dr. Smith suspected that a flare of her rheumatoid arthritis and/or fibromyalgia was worsening her back pain and prescribed a course of steroids.  (Tr. 373–75).  In July 2016, he approved plaintiff to return to work no more than 20 hours a week with frequent breaks from sitting.  (Tr. 371–72).  In August 2016, she reported that breaks from sitting had not helped and she was unable to continue working due to constant pain.  (Tr. 368–70).  Neurontin, tizanidine, and Norco made her tired and her pain worsened her depression.  Based on his examination, Dr. Smith thought plaintiff's opinion that she could not work was reasonable and excused her from work for one month.  In late August, 2016, Dr. Smith noted that she was unlikely to be able to

return to work, even on a halftime basis and, in September 2016, he completed short–term disability paperwork for her. (Tr. 360–62, 359).

On October 18, 2016, Dr. Smith noted that plaintiff's pain had worsened and extended into her tailbone and her toes. (Tr. 356–58). She was having to take pain medication more routinely. Although gabapentin was effective, it made her "too tired" and she was taking it at reduced doses. She still had pain due to fibromyalgia. Her anxiety and depression were stable, but she was frustrated by pain. She was able to sit for half an hour before her tailbone began to hurt and she had to get up to walk around. She could walk for 45 minutes at the grocery store but was worn out afterwards and had to lie down until that became too painful and she had to get up again. She was trying to walk more, even though it hurt her back because it improved her mood. Lifting and pushing or pulling heavy objects caused pain. An examination was unremarkable with the exception of slightly reduced strength at knee and hip. Dr. Smith assessed her with chronic radicular pain of the lower back, and sacroiliitis, with pain likely worsened by fibromyalgia and rheumatoid arthritis. He excused her from work until December 1, 2016. A nerve conduction study of plaintiff's left leg showed peroneal neuropathy likely due to a pinched nerve at the knee. (Tr. 782, 355–56).

On November 28, 2016, plaintiff told Dr. Smith that she was no better. (Tr. 351–54). Zanaflex was not especially helpful, gabapentin made her tired and, although pain medications helped, she was trying to cut down. She occasionally took Celebrex. She was concerned that her conditions were not improving and worried that she might not be able to work. On examination, Dr. Smith noted trigger points throughout plaintiff's back and at the hips and left knee. She also

had decreased strength at the knees.  He ordered her off work until mid–February 2017 to get further evaluations from a neurologist and rheumatologist.

In January 2017, Dr. Smith noted that plaintiff's pain in her left leg had worsened.  (Tr. 341–43).  He continued to believe that her pain was related to her fibromyalgia and rheumatoid arthritis.  In April 2017, plaintiff reported that chiropractic had helped a bit with her left leg pain but her low back pain continued.  (Tr. 537–41).  She reported that she lost consciousness on March 22, 2017, and continued to feel like she was going to pass out.  Her anxiety was building and she felt more panicky.  She weaned herself off gabapentin and rheumatoid arthritis medications.  After a normal EKG, Dr. Smith determined that she was suffering from dehydration which likely caused her episode of syncope.  He directed her to resume her medications.

Rheumatologist Faye Cohen, M.D., saw plaintiff 10 times between October 2014 and November 2016.[3]  On examinations, Dr. Cohen routinely noted trigger points without frank synovitis.  Plaintiff only occasionally displayed swollen joints or limited ranges of motion.  Blood tests were routinely negative, while scans disclosed mild osteoarthritis in plaintiff's sacroiliac joints, mild levoscoliosis in the lumbar spine, partial sacralization of the lower lumbar vertebrae, and no significant stenosis.  (Tr. 624-33, 413-15, 440-43).  It was Dr. Cohen's assessment that plaintiff's symptoms were due to fibromyalgia, arthralgia, seronegative rheumatoid arthritis, and fatigue related to fibromyalgia.  Over the course of treatment, Dr. Cohen made several changes to plaintiff's medication to try to address her symptoms.  In October 2014, she prescribed the NSAID Relafen, but noted in February 2015 that plaintiff was unable to "get" the medication, so she was taking Celebrex with good effect.  (Tr.  268–69).  In August 2015, Dr. Cohen prescribed nortriptyline for fibromyalgia.  (Tr. 269).  In  November 2015, Dr. Cohen noted that plaintiff had

---

[3] Plaintiff initially sought a second opinion from Dr. Cohen and continued in care with her.  (Tr. 268-69).

not started taking the nortriptyline and provided samples.  She also prescribed Lyrica and the immunosuppressant Arava, which improved plaintiff's joints.  (Tr. 269–70, 290–94, 285–89).  In November 2016, plaintiff reported that she had weaned herself off Arava because she wanted to reduce the number of medications she was taking.  (Tr. 574-78).  She noticed an increase in shoulder pain and agreed to resume Arava at a low dose.  Her medications at that time included Cymbalta, Neurontin, and hydrocodone–acetaminophen as needed.  There are no further records from a rheumatologist, although her primary care physician referred for a rheumatology consultation in January 2017.  (Tr. 341–43).

Pain specialist Sean Stoneking, M.D., saw plaintiff eight times between May 2016 and September 2017.  At the initial visit on May 27, 2016, plaintiff reported that she had pain in her low mid–back with occasional radiation to her tailbone and lower left extremity.  (Tr. 554–59). The pain was exacerbated by flexion, extension, sitting, and walking and relieved by ice, heat, and narcotics.  Seven session of physical therapy provided minimal improvement and chiropractic had not been helpful.  She had a normal gait and examinations of her cervical and thoracic spine were normal, while her lumbar spine showed decreased range of motion and pain with movement.  She had tenderness to palpation, moderate spasms, and positive straight leg raising on the left side. She also demonstrated positive responses to tests of the sacroiliac joints.  She was assessed with sacroiliitis, myalgia, chronic, bilateral low back pain with sciatica, and coccydynia.  Dr. Stoneking prescribed the muscle relaxant Zanaflex for myofascial pain and directed plaintiff to continue physical therapy and physical activity as tolerated.  On June 1, 2016, Dr. Stoneking injected plaintiff's left sacroiliac joint and piriformis muscle, which plaintiff later reported made her pain worse.  (Tr. 376–81).  On August 17, 2016, plaintiff's presentation was essentially unchanged and Dr. Stoneking performed a ganglion impar nerve block, from which she received no relief.  (Tr.

11

363–67, 348–51).  In December 2016, Dr. Stoneking referred plaintiff to a neurologist for left peroneal neuropathy.  (Tr. 348–51).  On August 15, 2017, he administered bilateral lumbar facet injections, from which plaintiff received 9 or 10 hours of relief.  (Tr. 566–70, 758–60, 761.  He repeated the injections on August 29, 2017, with relief greater than 50% for more than 8 hours.  (Tr. 767–68, 769, 771–78).  In September 2017, he performed a medial branch radiofrequency denervation at L3, L4, and L5.  (Tr. 771–78).  No further office visits with Dr. Stoneking are included in the record.

Neurologist Michael N. Polinsky, M.D., evaluated plaintiff on referral from Dr. Cohen in August 2016.  (Tr. 253–56).  An examination was normal with the exception of tenderness over the left sacroiliac joint and minimal restriction in range of motion at the lumbar spine.  Radiologic studies disclosed mild scoliosis, a probable sixth lumbar vertebra, minimal degenerative changes throughout the lumbar spine, without disc herniation, stenosis, or nerve root impingement.  Dr. Polinsky said that the etiology of plaintiff's pain was unclear and recommended she improve her spine health with physical therapy, good posture, proper body mechanics, weight loss, core muscle strengthening, and activity modification.  There was no particular target for injection or surgical intervention.

Orthopedist Matthew Melander, D.O., evaluated plaintiff's low–back and left–leg pain on October 28, 2016.  (Tr. 326–7).  She reported that her pain was now constant and radiated to her left toes.  She received no relief from sacroiliac joint injections, physical therapy, chiropractic treatment, and oral steroids.  X–rays and MRIs were normal.  She took gabapentin and Norco for pain and Cymbalta.  On examination, she had full strength, decreased deep tendon reflexes on the left side, indications of irritation of the peroneal nerve and fibular head, positive straight leg raising, and tenderness of the right sacroiliac joint.  She was assessed with sacroiliitis and

prescribed Neurontin and Flexeril and directed to physical therapy.  Dr. Melander subsequently recommended that plaintiff see a physiatrist.  (Tr. 329).

Neurologist Prityi Rani, M.D. saw plaintiff on three occasions in January 2017.  (Tr. 646–57, 440–43, 336–38).  Plaintiff reported that she had almost daily pain of mild to moderate intensity, triggered by activity and walking.  She reported joint, muscle and back pain, weakness, numbness, anxiety, and depression.  She obtained no relief from pain management or physical therapy, but hydrocodone helped.  An MRI of the lumbar spine showed normal alignment without fracture, destructive change, or edema.  (Tr. 405).  Disc spaces were adequately preserved.  There was a very small central bulge at L5–S1 that did not significantly compromise of the canal.  There was also mild facet hypertrophy at L4–L5 and L5–S1.  Plaintiff's sacroiliac joints appeared normal. An x–ray of the left–knee was also normal (Tr. 338, 404–05).  Dr. Rani opined that plaintiff's low back pain was probably due to degenerative disc disease with possible L5–S1 radiculopathy.  She also had left peroneal neuropathy.  Plaintiff refused Dr. Rani's offer of referral to a neurosurgeon or a repeat EMG.  Dr. Rani recommended plaintiff obtain a second opinion at a neurovascular clinic and maintain oral pain control.

Plaintiff saw chiropractor Ryan Eckman sporadically between March and July 2017 and again in August and September 2018.  (Tr. 544, 545, 546, 547, 821–22, 823–24,  825).  He routinely noted joint restrictions at multiple levels of her spine, pelvis, sacroiliac, and left knee, along with trigger points and occasional muscle spasms.  Treatments typically brought only temporary relief.  He diagnosed plaintiff with lumbago with sciatica, cervicalgia, and torticollis.[4]

---

[4] Cervical dystonia, also called spasmodic torticollis, is a painful condition in which the neck muscles contract involuntarily and cause the head to twist, tilt, or turn to the side.  There is no cure and sustained remissions are uncommon.  Mayo Clinic - cervical dystonia or spasmodic torticollis  (last visited Feb. 2, 2021).

On September 26, 2018, plaintiff underwent an EMG which showed a possible lesion involving the right L5–S2 nerve root bilaterally. (Tr. 826–29). A nerve conduction study showed reduced amplitude at the left peroneal nerve. There are no records from Dr. Ramis Gheath, who is identified as the ordering physician for these studies. A lumbar MRI on October 1, 2018, showed mild degenerative disc disease at L3–L4, without central canal stenosis or facet osteoarthritis, and with mild left foraminal stenosis. (Tr. 830–32).

### C.    Opinion Evidence

On June 17, 2016, primary care physician Brian Smith completed paperwork for plaintiff's short–term disability insurer. (Tr. 468). Her diagnoses were lumbar back pain, left lumbar radiculopathy, fibromyalgia, and rheumatoid arthritis, which were being treated with lidocaine patches, gabapentin, Norco as needed for pain, tizanidine, Volteran gel, Medrol Dosepak, and steroid injections. She became unable to work on April 25, 2016, and was not expected to be able to return to work until July 8, 2016. Dr. Smith provided another statement to the insurer on October 25, 2016. (Tr. 788–89). He listed plaintiff's diagnoses as chronic back pain, sacroiliitis, rheumatoid arthritis, fibromyalgia, depression, and radicular pain. Her treatment included pain management, neurological evaluation, orthopedic evaluation, and treatment by a rheumatologist. Sacroiliac joint injections and physical therapy failed to provide relief. Her medications included Norco as needed, Cymbalta, gabapentin, tizanidine, lidocaine patch, Arava, and Celebrex. Dr. Smith opined that in a work day with two breaks and a meal break plaintiff would be able to lift/carry and push and pull no more than 10 pounds. She could sit for two to three hours a day with positional change every 30 minutes, stand for two to three hours a day for no more than 30 minutes at a time, and walk for two to three hours a day for no more than 45 minutes at a time, but was worn out after walking. She could never bend or stoop and only occasionally reach or drive,

14

unless she was taking sedating medication, when she should not drive at all.  These restrictions were expected to last until December 1, 2016.  The ALJ gave Dr. Smith's opinions limited weight (Tr. 21).  The ALJ stated that "Dr. Smith's opinions stand alone with limitations that were not mentioned" in his treatment records and were not supported "by objective testing or reasoning that would indicate why the [plaintiff's] functioning need be so restrictive."  In addition, his "pattern of treatment . . . was generally conservative without escalating modalities."  Finally, the insurance forms he completed used a standardized, check–box format that did not require supporting reasoning or clinical findings, which made the opinions less persuasive.  Plaintiff argues that the ALJ improperly discounted Dr. Smith's opinion.

On March 21, 2017, Marsha Toll, Psy.D., completed a Psychiatric Review Technique form based on a review of the records.  (Tr. 69–70).  Dr. Toll found that plaintiff had medically determinable impairments in the categories of 12.04 (affective disorders) and 12.06 (anxiety disorders), but that they were not severe.  Dr. Toll opined that plaintiff had mild restrictions in understanding, remembering, and applying information; in concentrating, persisting, or maintaining pace; and in adapting or managing herself.  She had no restrictions in interacting with others.  While medical evidence showed that plaintiff had a history of generalized anxiety disorder and depression, she had not sought specialized or emergency care.  Plaintiff's claimed limitations in her activities of daily living were primarily associated with her physical impairments.  Noting that plaintiff had unremarkable mental status exams and no specialized mental health treatment, the ALJ found that Dr. Toll's opinion was generally consistent with the medical record as a whole and entitled to considerable weight.  (Tr. 15).  Plaintiff does not contest the weight the ALJ gave to Dr. Toll's opinion.

On March 22, 2017, State agency nonexamining physician John Jung, M.D., assessed plaintiff's physical residual functional capacity based on a review of the records then on file. (Tr. 68–69, 71–74). Plaintiff had severe impairments of degenerative disc disease, inflammatory arthritis, and fibromyalgia. Dr. Jung opined that plaintiff was able to occasionally lift or carry up to 20 pounds and frequently lift or carry up to 10 pounds; stand or walk, and sit for 6 hours in an 8-hour day; and was able to use hand and foot controls. She should avoid even moderate exposure to extreme cold, wetness, vibration, and hazards. Dr. Jung noted that medical evidence supported diagnoses for lumbar spine degenerative disc disease, rheumatoid arthritis, and fibromyalgia. Plaintiff had sought consistent treatment for her impairments but continued to complain of pain and functional limitations. Exams consistently showed full strength, intact sensation, normal reflexes, and normal gait. Nonetheless, when combined with rheumatoid arthritis and fibromyalgia, "it is reasonable to expect ongoing pain and functional limitations" as spelled out above. (Tr. 73). The ALJ gave moderate weight to Dr. Jung's opinion because he was a nonexamining consultant who did not review subsequent treatment records showing slightly greater limitations. (Tr. 21).

On January 19, 2018, physical therapist Kevin Wilhite, MPT, completed a 3.5 hour functional capacity evaluation for the purpose of determining plaintiff's overall ability to complete an 8–hour workday. (Tr. 796–810). Her diagnoses included sacroiliitis, lumbago with sciatica, myalgia, and injury of the peroneal nerve at the lower leg. In a summary of his findings, Mr. Wilhite stated that he was unable to classify plaintiff in a "physical demand level." This was because, although she was able to lift at the sedentary level, plaintiff was "so severely limited in her sitting, standing and walking tolerances that she [did] not demonstrate the ability to sustain productive work." (Tr. 796). While sitting, she complained of pain in the left leg and changed

positions every three or four minutes in an effort to find a different posture for that leg.  These constant shifts interrupted her work flow and reduced her productivity.  She had hypersensitivity in all postures, with high subjective pain reports and poor strategies for coping with pain.  She demonstrated consistent but self–limiting performance throughout the evaluation.  "This, in combination with physiological responses (heart rate and respiratory rate), movement and muscle recruitment patterns both aware and unaware of observation, indicates that the results of this evaluation can be considered to be an accurate representation of  [plaintiff's] functional abilities at this point in time."  Id.  Mr. Wilhite proposed that she participate in a "comprehensive pain education program focusing on pain neuroscience education, graded activity and graded exposure to functional activity" as a path to returning to productive work.  The ALJ gave Mr. Wilhite's opinion "little weight."  (Tr. 21).  The ALJ noted that, as a physical therapist, he was not an "acceptable medical source," as defined by the regulations.  "[H]is statements, however, may be used to show the severity of the individual's impairments, how it affects the individual's ability to function, and has been considered with respect to severity and effect on function."  The ALJ nonetheless dismissed Mr. Wilhite's opinions as "based upon [plaintiff's] subjective responses" and "not consistent with the medical record of evidence as a whole, particularly . . . [plaintiff's] conservative pattern of treatment, only minimally supportive diagnostic imaging, and physical examinations," along with the absence of a treating relationship.  Id.  Plaintiff argues that the ALJ erred in his assessment of Mr. Wilhite's observations.

### III.  Standard of Review and Legal Framework

To be eligible for disability benefits, plaintiff must prove that she is disabled under the Act.  See Baker v. Sec'y of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).  The Act defines a disability as the "inability to

engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A) and 1382c (a)(3)(A).  A claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B); see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Social Security Administration has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009).  Steps one through three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment.  Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009); see also Bowen, 482 U.S. at 140-42 (explaining the five-step process).  If the claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five.  Pate-Fires, 564 F.3d at 942.  "Prior to step four, the ALJ must assess the claimant's residual functional capacity (RFC), which is the most a claimant can do despite her limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)).  At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past."  20 C.F.R. § 404.1520(e).  The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work.  Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005).  If the ALJ holds at step four that a

18

claimant cannot return to past relevant work, the burden shifts at step five to the Administration to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy.  Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001); see also 20 C.F.R. § 404.1520(f).

The Court's role on judicial review is to determine whether the ALJ's finding are supported by substantial evidence in the record as a whole.  Pate-Fires, 564 F.3d at 942.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019). "[T]he threshold for such evidentiary sufficiency is not high."  Id.  Stated another way, substantial evidence is "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision."  Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir. 2008); see also Wildman v. Astrue, 964 F.3d 959, 965 (8th Cir. 2010) (same).  In determining whether the evidence is substantial, the Court considers evidence that both supports and detracts from the ALJ's decision.  Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007).

The Eighth Circuit has repeatedly emphasized that a district court's review of an ALJ's disability determination is intended to be narrow and that courts should "defer heavily to the findings and conclusions of the Social Security Administration."  Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010) (quoting Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001)).  Despite this deferential stance, a district court's review must be "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision."  Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).  The district court must "also take into account whatever in the record fairly detracts from that decision."  Id.; see also Stewart v. Sec'y of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (setting forth factors the court must

19

consider).  Finally, a reviewing court should not disturb the ALJ's decision unless it falls outside the available "zone of choice" defined by the evidence of record.  Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011).  A decision does not fall outside that zone simply because the reviewing court might have reached a different conclusion had it been the finder of fact in the first instance. Id.; see also McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010) (explaining that if substantial evidence supports the Commissioner's decision, the court "may not reverse, even if inconsistent conclusions may be drawn from the evidence, and [the court] may have reached a different outcome").

## IV.  The ALJ's Decision

The ALJ's decision in this matter conforms to the five-step process outlined above.  (Tr. 10-24).  The ALJ found that plaintiff met the insured status requirements through December 31, 2020, and had not engaged in substantial gainful activity since April 22, 2016, the alleged onset date.  (Tr. 12–13).  At step two, the ALJ found that plaintiff had the severe impairments of rheumatoid arthritis, degenerative disc disease, coccydynia, torticollis, and peroneal neuropathy. (Tr. 13).  The ALJ found that "[a]ll other impairments" that plaintiff alleged or the record mentioned, including mental impairments, were not severe.  Id.  Plaintiff does not challenge the ALJ's assessment of her severe impairments.  The ALJ determined at step three that plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of a listed impairment, and specifically addressed listing 1.02 — major dysfunction of a joint; listing 1.04 — disorders of the spine; listing 11.00 — neurological disorders; and listing 14.09 — inflammatory disorders.  (Tr. 15–16).

The ALJ next determined that plaintiff had the RFC to perform sedentary work, except that she must be able to alternate between sitting and standing positions every thirty to sixty minutes

for a few minutes at a time while remaining at the work station with no loss in production.  In addition, she could only occasionally push/pull with her arms, or operate foot controls.  She could occasionally climb ramps or stairs, but never ladders, ropes, or scaffolds.  She could occasionally stoop, kneel, crouch, crawl, and balance on narrow, slippery, or erratically moving surfaces.  She must not be exposed to unshielded moving mechanical parts and hazardous machinery and should not drive as part of her work.  She was able to understand, remember, and carry out simple and routine instructions and tasks consistent with unskilled jobs.[5]  (Tr. 16–17).  In assessing plaintiff's RFC, the ALJ summarized the medical record; written reports from plaintiff and her husband; plaintiff's work history; and plaintiff's testimony regarding her abilities, conditions, and activities of daily living.  (Tr. 17–22).

With respect to the objective medical evidence, the ALJ concluded that "the pattern of treatment, physical examinations, and diagnostic imaging are consistent with an individual who is experiencing some symptoms that would be expected to cause limits" consistent with sedentary work.  (Tr. 18).  The record did not "not reflect frequent, escalating, or intense treatment, extreme structural abnormalities, or objective clinical signs indicative of functional deficits beyond" sedentary work.  Id.  Her physical examinations during the relevant period supported her allegations of lower back pain and left leg pain "but do not otherwise demonstrate a coherent picture of ongoing or recurrent objective indicators of functional deficits."  (Tr. 19).  In this context, the ALJ noted that plaintiff has fibromyalgia, "which does not necessarily lend itself to objective indicators."  Id.  Plaintiff's "pattern of treatment" for fibromyalgia, however, did not reflect "intensive or escalating treatment that would be supportive of" significant restrictions beyond those in the RFC.  Id.  The ALJ acknowledged that plaintiff had seen rheumatologists,

---

[5]The ALJ specified that plaintiff could work at jobs with a Specific Vocational Preparation level of 1 or 2.

neurologists, orthopedists, physical therapists and pain management specialists but, with the exception of her primary care physician and rheumatologist, her treatment "was halting with no coherent escalating pattern of treatment."  Id.  And, the treatment provided by her primary care physician and rheumatologist was "conservative without significant treatment escalation."  Id.

The ALJ described plaintiff's work history as "long" with "some good earnings . . . consistent with [plaintiff's] allegations that except for her impairments she would be working." (Tr. 20).  This "supportive work record" was outweighed by the "limited objective evidence and other factors that are inconsistent" with plaintiff's statements regarding the intensity, persistence, and limiting effects of her symptoms.  Id. The ALJ characterized plaintiff's daily living activities as substantial and inconsistent with her allegations of disabling symptoms and limitations.  With respect to the statement by plaintiff's husband, the ALJ discounted his opinion as inconsistent with the medical evidence.  (Tr. 21–22).

At step four, the ALJ concluded that plaintiff was unable to return to any past relevant work.  (Tr. 22).  Her age on the alleged onset date placed her in the "younger individual" category. She had at least a high school education and was able to communicate in English.  Id.  The transferability of job skills was not an issue because using the Medical-Vocational Rules as a framework supported a finding that plaintiff was not disabled whether or not she had transferable job skills.  The ALJ found at step five that someone with plaintiff's age, education, work experience, and residual functional capacity could perform other work that existed in substantial numbers in the national economy, namely as a stuffer, inspector, and table worker.  (Tr. 22–23). Thus, the ALJ found that plaintiff was not disabled within the meaning of the Social Security Act from April 22, 2016 through January 2, 2019 — the date of the decision.  (Tr. 23–24).

## V. **Discussion**

Plaintiff argues that the ALJ improperly discounted the opinions of Dr. Smith and Mr. Wilhite.

When evaluating opinion evidence, an ALJ is required to explain in the decision the weight given to any opinions from treating sources, non-treating sources, and non-examining sources. See 20 C.F.R. § 404.1527(e)(2)(ii). The regulations require that more weight be given to the opinions of treating physicians than other sources.[6] 20 C.F.R. § 404.1527(c)(2). Similarly, more weight is given to examining sources than to nonexamining sources. 20 C.F.R. § 404.1572(c)(1). According to the regulations, the opinions of treating medical sources are given more weight because they are likely to be the medical professionals most able to provide a detailed, longitudinal picture of the claimant's impairments and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. 20 C.F.R. § 404.1527(c)(2). "A treating physician's opinion should be granted controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." Nowling v. Colvin, 813 F.3d 1110, 1122 (8th Cir. 2016) (internal quotation and citations omitted). A treating physician's opinion, however, "does not automatically control or obviate the need to evaluate the record as a whole." Id. at 1122-23 (citation omitted). Rather, "an ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough

---

[6]This continues to be true for plaintiff's claim because it was filed before March 27, 2017. Combs v. Berryhill, 868 F.3d 704, 709 (8th Cir. 2017); 20 C.F.R. § 404.1527 ("For claims filed . . . before March 27, 2017, the rules in this section apply."); § 404.1527(c)(1) ("Generally, we give more weight to the medical opinion of a source who has examined you than to the medical opinion of a medical source who has not examined you.").

23

medical evidence or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Id. (citation omitted).

Where the ALJ does not give a treating physician's opinion controlling weight, the ALJ must evaluate the opinion based on several factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, the evidence provided by the source in support of the opinion, the consistency of the opinion with the record as a whole, and the level of specialization of the source. 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6).  And, the ALJ must give "good reasons" for discounting a treating physician's opinion. See Davidson v. Astrue, 501 F.3d 987, 990 (8th Cir. 2007) (internal quotation marks omitted); see also 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's medical opinion.").  The failure to give good reasons for discrediting a treating physician's opinion is a ground for remand.  Snider v. Saul, No. 4:18-CV-1948-SPM, 2020 WL 905851, at *4 (E.D. Mo. Feb. 25, 2020) (citing Anderson v. Barnhart, 312 F. Supp. 2d 1187, 1194 (E.D. Mo. 2004) ("Failure to provide good reasons for discrediting a treating physician's opinion is a ground for remand"); Clover v. Astrue, No. 4:07CV574–DJS, 2008 WL 3890497, at *12 (E.D. Mo. Aug. 19, 2008) ("Confronted with a decision that fails to provide 'good reasons' for the weight assigned to a treating physician's opinion, the district court must remand.")).

Here, the Court concludes that the ALJ's assessment of Dr. Smith's and Mr. Wilhite's findings is based on an incomplete characterization of their reports and thus this matter must be remanded.  For example, the ALJ rejected Mr. Wilhite's report because it was based on plaintiff's

subjective responses.[7]  It is true that Mr. Wilhite described plaintiff as engaging in "self–limiting" performance.  But he also identified physiologic responses — increased heart and respiratory rates — that indicated that her performance was an accurate representation of her abilities at that time.  The ALJ's failure to address the objective signs supporting Mr. Wilhite's conclusions is not harmless in this case because Mr. Wilhite's observations regarding plaintiff's frequent postural changes and tolerance are relevant to determining her RFC.

The ALJ made similar errors in addressing Dr. Smith's opinions, which he discounted as "stand[ing] alone with limitations that were not mentioned" in his treatment records.  This is not accurate.  For example, on May 9, 2016, Dr. Smith limited plaintiff to lifting no more than 10 pounds and from performing repetitive bending, twisting, stooping, or kneeling for a two–week period.  (Tr. 387).  On July 8, 2016, Dr. Smith restricted her to a 20–hour work week with frequent breaks from sitting.  (Tr. 372).  In August 2016, Dr. Smith noted that plaintiff was doing much worse after returning to work and excused her until September 9, 2016.  (Tr. 370).  The ALJ also found that Dr. Smith's opinions were not supported with objective testing or reasoning to explain why plaintiff's function was so restricted.  (Tr. 21).  This lack of objective clinical signs is not unusual in patients with fibromyalgia.  See Clarambeau v. Saul, No. 4:19-CV-04170-VLD, 2020 WL 3097771, at *24 (D.S.D. June 11, 2020) ("[t]he musculoskeletal and neurological examinations are normal in fibromyalgia patients, and there are no laboratory abnormalities) (quoting Harrison's Principles of Internal Medicine, at 2056 (16th ed. 2005)).  Finally, the ALJ noted that the treatment Dr. Smith provided was "conservative without escalating modalities."  (Tr.

_____

[7] It is undisputed that Mr. Wilhite is not "an acceptable medical source" because he is a physical therapist.  Nonetheless, his statements "are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file."  Titles II & XVI: Considering Opinions & Other Evidence from Sources Who Are Not "Acceptable Med. Sources" in Disability Claims; Considering Decisions on Disability by Other Governmental & Nongovernmental Agencies, SSR 06-03P (S.S.A. Aug. 9, 2006).

21).  The record establishes that plaintiff saw multiple specialists, had trials on several medications, and underwent pain–management interventions, all with out lasting effect.  In addition, neurologist Dr. Polinsky opined that surgery and further injections were not warranted.  Based on this treatment history, it is unclear what escalating modalities would have been appropriate.

* * * * *

For the foregoing reasons, the Court finds that the ALJ's determination is not supported by substantial evidence on the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **reversed** and this matter is **remanded** pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings.

/s/ ***John M. Bodenhausen***
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this 23rd day of February, 2021.